NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-918                                          Appeals Court

COMMONWEALTH  vs.  WAYNE NUTTER.

No. 13-P-918.

Hampden.     September 8, 2014. - April 8, 2015.

Present:  Berry, Kafker, & Maldonado, JJ.

Rape.  Child Abuse.  Privileged Communication.  Evidence,
    Privileged communication, Communication to clergyman,
    Polygraph test, Business record.  Witness, Privilege,
    Polygraphic test.  Constitutional Law, Polygraph test,
    Confrontation of witnesses.  Due Process of Law, Polygraph
    test.  Practice, Criminal, Mistrial, Conduct of prosecutor,
    New trial.  Registrar of Motor Vehicles, Records.

Indictments found and returned in the Superior Court
Department on February 10, 2011.

The cases were tried before Peter A. Velis, J., and a
motion for a new trial was heard by him.

William W. Adams for the defendant.
Katherine A. Robertson, Assistant District Attorney, for
the Commonwealth.

BERRY, J.  A Superior Court jury convicted the defendant of

two counts of aggravated rape and abuse of a child, G. L.

c. 265, § 23A.  In this appeal, the defendant claims that the

trial judge erred in: (1) admitting inculpatory statements the defendant made to his former pastor during a telephone conversation, because the statements were protected by the priest-penitent privilege, G. L. c. 233, § 20A; (2) failing to grant a mistrial after the defendant's wife testified that she had asked the defendant to take a lie detector test; and (3) admitting a certified copy of a record from the Registry of Motor Vehicles in violation of the defendant's confrontation rights under the Sixth Amendment to the United States Constitution. The defendant also claims the judge abused his discretion in denying the defendant's motion for a new trial. In his motion for a new trial, the defendant claimed that there was prosecutorial misconduct in deliberately eliciting inadmissible testimony -- i.e., the defendant's wife's statement that she had asked him to take a lie detector test. We affirm.

1. Background. The following is taken from the trial record. There was trial evidence that in approximately 2000, the defendant began sexually abusing his then six year old stepdaughter (victim). According to the victim's testimony, the abuse continued until approximately 2010, when she was almost sixteen years old. In early October, 2010, the defendant met his wife at a Dunkin' Donuts in Westfield for several hours to

discuss their pending divorce.[1]  During that meeting, the defendant's wife asked the defendant if he had done anything sexual to the victim.  The defendant responded that he had gone into her room two times between November, 2009, and January, 2010, and "touched her on the top and on the bottom and that he didn't know if he had penetrated."

After this meeting, the defendant called Pastor Christopher Hazzard, of St. John's Lutheran Church, who had previously counseled the defendant and his wife.  At trial, Pastor Hazzard testified that the defendant had told him that the victim had said her accusations of sexual abuse were not a dream, and that he did not remember whether he had done it.  The defendant also admitted to Pastor Hazzard that he had told his wife "what he thought [she] wanted to hear so that he could have a shot of keeping the kids."

2.  Priest-penitent privilege.  The defendant argues that the judge erred in denying his motion in limine to exclude Pastor Hazzard's testimony, because the defendant's statements to the pastor were made in the course of seeking spiritual guidance, comfort, and counsel, and therefore were protected by the priest-penitent privilege under G. L. c. 233, § 20A.  That statute states:

---

[1] When divorce proceedings were commenced and by whom are unclear from the record.  At trial, the defendant's wife testified that she was still legally married to the defendant.

> "A priest . . . or ordained or licensed minister of any church . . . shall not, without the consent of the person making the confession, be allowed to disclose a confession made to him in his professional character, in the course of discipline enjoined by the rules or practice of the religious body to which he belongs; nor shall a priest . . . or ordained or licensed minister of any church . . . testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, without the consent of such person."

G. L. c. 233, § 20A, inserted by St. 1962, c. 372. See generally Mass. G. Evid. § 510 (2014). Prior to trial, the judge held an extensive voir dire hearing to determine the applicability of the priest-penitent privilege.[2]

During the hearing, Pastor Hazzard explained that for a time he had regularly met with the defendant and his wife and counseled them on marital and parenting matters. However, after the defendant's wife obtained a restraining order against the defendant, Pastor Hazzard suggested that the defendant "seek spiritual aid and counsel at a different congregation." The defendant did so. After that date, Pastor Hazzard had limited contact with the defendant, other than an occasional telephone call.

Pastor Hazzard also testified that, in early October, 2010, while attending a conference at a retreat center in Westfield,

---

[2] The parties filed cross motions in limine regarding the application of the priest-penitent privilege. See G. L. c. 233, § 20A.

he received a telephone call from the defendant. The defendant was "pretty distraught," and there "seemed to be a lot of remorse, a lot of sorrow, a lot of tears." During the telephone call, the defendant admitted to Pastor Hazzard that he had told his wife that he had touched the victim. The defendant explained "he wanted to have the kids back, and [the defendant] felt that if he said what [his wife] wanted to hear that maybe the kids would be able to [come] back to him." However, the defendant also told Pastor Hazzard that he did not remember whether he had actually touched the victim.

Pastor Hazzard did not view the defendant's statements to him during the telephone call as a pastoral confession.[3] It appeared to the pastor that the defendant's purpose in calling him was to look for someone who could bring some influence to bear on the situation and act as a middle man between the defendant and his wife. The pastor's initial impression was that the defendant was seeking "comfort," but in the sense that he was seeking someone to show him sympathy and intervene on his

---

[3] During the voir dire hearing, Pastor Hazzard testified that there is a formal process for confession and absolution in the Lutheran Church and that it would be extremely unusual for him to take a confession and profess absolution over the telephone. Although not dispositive, as the statute applies not only to confessions, but to communications as well, we think it relevant that the defendant's statements to Pastor Hazzard were made outside the "rules or practice of the religious body to which [the pastor] belong[ed]." G. L. c. 233, § 20A. See Mass. G. Evid. § 510.

behalf. Pastor Hazzard thought that "it could be manipulation as well," on the theory that the defendant might have recognized that his statements were incriminating and that the defendant might have felt a "need to cover [his] tracks." The next day, the judge ruled that Pastor Hazzard's testimony was not barred by the priest-penitent privilege. The judge's ultimate finding was "that the [defendant's telephone] call itself was not made for the sole purpose of seeking spiritual advice and counsel and not even for the main purpose of seeking spiritual advice and counseling."

The priest-penitent privilege is "strictly construed and applies only to communications where a penitent seek[s] religious or spiritual advice or comfort." Commonwealth v. Vital, 83 Mass. App. Ct. 669, 672 (2013), quoting from Commonwealth v. Kebreau, 454 Mass. 287, 301 (2009). Whether the defendant's communications are protected under the terms of the statute is a question of law. Id. at 303. Part of the analysis, however, involves factual determinations concerning the defendant's intent. Such factual determinations are for the trial judge. Ibid.

In Kebreau, the defendant attended a family meeting in a Haitian Baptist Church classroom at the "urging of his wife and his wife's pastor to discuss a 'family issue.'" Ibid. The judge held that the defendant's inculpatory statements during

the meeting were not privileged, as "the nature of the defendant's participation in the meeting was not 'for the purpose of seeking spiritual advice or comfort,' but rather to avoid what the judge characterized as the 'train going right at [the defendant's] forehead.'" Ibid. Similarly, in Vital, this court held that a trial judge properly allowed a pastor to testify as to his conversations with the defendant because he had communicated with the pastor to ask him to convince the victim and her family to settle the allegations of abuse in the church instead of in court, rather than for religious or spiritual advice. Commonwealth v. Vital, supra at 671-674.

Viewed in this light, here, the trial judge did not err in admitting the defendant's statements to Pastor Hazzard. The defendant in the instant case, like the defendants in Kebreau and Vital, did not communicate with Pastor Hazzard to receive "religious or spiritual advice or comfort." G. L. c. 233, § 20A. Pastor Hazzard's testimony established that the defendant feared losing his children, may have suspected that criminal charges were possible, and, according to the pastor, was looking for "anyone that could bring to bear any kind of influence on the situation" and act as a "middle man" between the defendant and his wife. It seems clear that the defendant, like the defendants in Kebreau and Vital, did not call Pastor Hazzard to receive spiritual comfort, as the defendant urges,

but rather sought to enlist the pastor's assistance in an attempt to avoid the possible consequences of his admissions -- i.e., the "train going right at [the defendant's] forehead." Commonwealth v. Kebreau, supra at 303.

The judge permissibly found that the defendant had "switched churches," and that as a consequence there was "a lack of membership" at St. John's Lutheran Church. These findings are supported by the record. Pastor Hazzard testified that he had asked the defendant to seek spiritual guidance elsewhere, that the defendant had done so, and that the pastor's relationship with the defendant at that point was "very ambiguous." While not dispositive, "since the statute plainly applies to 'any person . . . seeking religious or spiritual advice,'" the lack of an ongoing pastoral relationship between the defendant and Pastor Hazzard, and the defendant's lack of continued attendance at St. John's Lutheran Church, were appropriate factors for the judge to consider in determining the defendant's intent in calling Pastor Hazzard. See ibid. (defendant's prior sporadic contact with pastors and lack of regular attendance at church was relevant to determining purpose in attending family meeting at church). These factors further support the conclusion that the communications were not made to Pastor Hazzard "in his professional character." G. L. c. 233, § 20A. See generally Mass. G. Evid. § 510.

3. <u>Polygraph reference and motion for mistrial</u>. At trial, the defendant's wife testified that during her conversation with the defendant at Dunkin' Donuts in early October, 2010, she had asked the defendant "if he would take a lie detector test." Defense counsel objected and moved to strike. At a sidebar conference, the judge admonished the prosecutor for failing to comply with his prior ruling that that type of testimony should not be mentioned.[4] The defendant moved for a mistrial. The

---

[4] On the previous day of trial, defense counsel had orally moved to exclude any reference to a polygraph test. The prosecutor contended that the defendant's statements were admissible as admissions by a party opponent. See Mass. G. Evid. § 801(d)(2)(A) (2014). A sidebar conference concerning the polygraph test and the defendant's comment that he would fail was not definitive, but the judge seemed to signal he would exclude the conversation between the defendant and his wife.

<u>Defense counsel</u>: "[D]uring that conversation, [the wife] asked him to take a lie detector test, and he commented on that. I would ask that that be excluded."

<u>The court</u>: "Do you want that in?"

<u>Prosecutor</u>: "Well, he said 'I would fail.' He didn't say 'I'm not.' He said, 'I would fail.'"

<u>The court</u>: "I'm not going to cloak her to the aura, the crime element with the aura from the fact finder or a credibility determined, A, she, 'You take a lie detector test?' Do you want that type of testimony in? You are not serious?"

<u>Prosecutor</u>: "Well, what I'm really trying to get in, Your Honor, is the Defendant's statements . . . "

<u>The court</u>: "His statement is coming in. Did he say, 'Give me a lie detector test?['] Do you want that? Do

prosecutor explained that she had misunderstood the judge's previous ruling and that she believed the statement was admissible as a statement by a party opponent.  Having found no misconduct on the part of the prosecutor, the judge issued a forceful curative instruction.  Specifically, the judge instructed the jury:  "[Y]ou are to totally ignore, put out of your minds, disregard, never consider any testimony that you may have heard regarding a lie detector test.  You are to totally

---

|  | you want that?  She asked him, 'Would you take a lie detector test.'" |
|---|---|
| Prosecutor: | "And he said, 'I would fail.'"<br><br>... |
| The court: | "Well, she's [the prosecutor] doing it through the evidence.  When do we hear from [the defendant's wife]?  [She] is going to say what he said, right?  That's his statement, and his full statement if she so requests, okay, so that it is complete, but I guess I don't know why he said that and I don't know if she intends to put in his full statement."<br><br>... |
| Prosecutor: | "And I have instructed her not to orchestrate that part of what he said was involving his two children which I have instructed her not to get into, but through cross-examination, I don't know.  I don't know where that is going to go, but I have made it clear and I take it to the issue of the other kids." |
| The court: | "But for tomorrow -- are we all set on how I have ruled?" |
| Prosecutor: | "Yes, Your Honor." |

disregard any testimony that you may have heard regarding a lie detector test."

The defendant contends that the prosecutor deliberately failed to follow a clear directive from the judge and the judge's curative instruction to the jury to ignore the testimony was insufficient to cure the prejudice caused, and that, as a consequence, reversal is compelled and the judge abused his discretion in denying the defendant's motion for a mistrial. We reject these contentions.

First, from all that appears, the prosecutor did not act in bad faith, or knowingly attempt to violate the judge's ruling. Indeed, the judge stated that he accepted the prosecutor's explanation that she had misunderstood his statements and final position at the sidebar conference concerning exclusion of the defendant's admission to his wife that he would fail a polygraph. Consistent with the prosecutor's misunderstanding, there does seem to be some ambiguity in the ultimate rulings at the sidebar conference. See note 4, supra.

Second, while "polygraph evidence is inadmissible for any purpose in a criminal trial," Commonwealth v. Martinez, 437 Mass. 84, 88 (2002), an isolated reference to a polygraph test does not, per se, constitute reversible error, nor warrant a mistrial. See Commonwealth v. Corcione, 364 Mass. 611, 620 (1974). "Where a party seeks a mistrial in response to the

jury's exposure to inadmissible evidence, the judge may 'correctly rel[y] on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant.'" Commonwealth v. Kilburn, 426 Mass. 31, 37-38 (1997), quoting from Commonwealth v. Amirault, 404 Mass. 221, 232 (1989). "Generally, as long as the judge's instructions are prompt and the jury do not hear the inadmissible evidence again, a mistrial is unnecessary." Kilburn, supra at 38. Here, the judge's curative instructions were prompt, forceful, and fully instructed the jury to completely ignore the singular and brief reference to the polygraph test. See Commonwealth v. Williams, 450 Mass. 645, 651 (2008) ("Jurors are presumed to follow a judge's instructions, including instructions to disregard certain testimony").

4. Registry of Motor Vehicles (RMV) record. Equally unpersuasive is the defendant's contention that the introduction of a certified copy of a record from the RMV showing his image, license status, and demographic information, including his date of birth, violated his confrontation rights under the Sixth Amendment. See Melendez-Diaz v. Massachusetts, 557 U.S. at 309-329. The certified record contained information maintained by the RMV in the ordinary course of business and for the administration of the RMV's affairs, and not for the purpose of proving some fact at trial. As a result, the admission of the

RMV record did not violate the defendant's confrontation rights. See Commonwealth v. McMullin, 76 Mass. App. Ct. 904, 904 (2010). A clerk's certificate authenticating the RMV record does not change this result.  See Commonwealth v. Parenteau, 460 Mass. 1, 9 (2011).  "Unlike the certificates at issue in Melendez-Diaz, which are created solely to prove an element of the prosecution's case, RMV records are maintained independent of any prosecutorial purpose and are therefore admissible in evidence as ordinary business records."  Commonwealth v. Ellis, 79 Mass. App. Ct. 330, 335 (2011).

5.  Motion for a new trial.  Finally, the defendant claims the judge abused his discretion in denying the defendant's motion for a new trial.  In his motion for a new trial, the defendant alleges prosecutorial misconduct -- i.e., the prosecutor deliberately elicited testimony from the defendant's wife that she had asked the defendant if he would take a polygraph test.  "A motion for a new trial is addressed to the sound discretion of the judge, and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, or unless the trial was infected with prejudicial constitutional error."  Commonwealth v. Moore, 408 Mass. 117, 125 (1990) (citations omitted).  As previously discussed, the judge found no prosecutorial misconduct and accepted the prosecutor's assertion that she had misunderstood his previous ruling.  From

all that appears in the record, that finding is well supported. "Reversal for abuse of discretion is particularly rare where [as here] the judge acting on the motion was also the trial judge." Commonwealth v. Schand, 420 Mass. 783, 787 (1995). The motion for a new trial was properly denied.

Judgments affirmed.

Order denying motion for new trial affirmed.